# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Michael Knotts, *on Behalf of Himself and All Others Similarly Situated*, | File No. 17-cv05049 (SRN/SER) |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| v. | |
| Nissan North America, Inc., | |
| Defendant. | |

---

Melissa S. Weiner, Pearson Simon & Warshal, LLP, 800 LaSalle Ave., Ste. 2150, Minneapolis, MN 55402; James C. Shah and Natalie Finkelman Bennett, Shepherd Finkelman Miller & Shah, LLP, 35 East State Street, Media, PA 19063, for Plaintiff.

Mark A. Solheim, Larson King, LLP, 30 E. 7th Street Suite 2800, St. Paul, MN 55101; Edwin Paul Cauley , Jr. and Sherman Vance Wittie, Drinker Biddle & Reath LLP, 1717 Main Street Suite 5400, Dallas, TX 75201, for Defendant.

---

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on two motions filed by Defendant Nissan North America ("NNA"): (1) a Motion to Dismiss [Doc. No. 15] pursuant to Federal Rule of Civil Procedure 12(b)(6); and (2) a Motion to Strike or Dismiss Plaintiff's Class Allegations [Doc. No. 21] based on the U.S. Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773 (2017). For the reasons set forth below, Defendant's Motion to Dismiss under Rule 12(b)(6) is granted in part and denied in part and Defendant's Motion to Strike is denied.

## I.     BACKGROUND

### A.     Factual Background

Plaintiff Michael Knotts, a citizen of Minnesota, alleges that in approximately October 2012, he purchased a new Nissan Versa from Morrie's Nissan, an authorized Nissan dealership located in Brooklyn Park, Minnesota. (Compl. ¶ 13 [Doc. No. 1].) Defendant NNA is a California corporation with its principal business office in Sacramento, California, and its North American headquarters in Franklin, Tennessee. (*Id.* ¶ 14.) It markets, sells, and warrants vehicles, including 2012 Nissan Versas, through an established network of licensed dealers and distributors. (*Id.* ¶ 18.)

The subject vehicle that Plaintiff purchased was built with a continuously variable automatic transmission ("CVT"). (*Id.*) A CVT is a "modified automatic transmission that employs a single, adaptable belt and a dual-pulley mechanism." (*Id.* ¶ 2.) It is designed such that the "'drive pulley' and 'driven pulley' work opposite one another, constantly creating different gear ratios, allowing for smooth acceleration and deceleration." (*Id.*) Knotts alleges that NNA advertised and continues to advertise the CVT as a "next-generation" transmission, designed to "provide smoother performance, quicker acceleration, and better fuel economy than ever before." (*Id.* ¶ 3.)

NNA provides its customers with a three-year, 36,000-mile limited vehicle warranty and a five-year, 60,000-mile powertrain[1] warranty on all of its vehicles (the "Warranty").

---

[1] The "powertrain" is "the intervening mechanism by which power is transmitted from an engine to a propeller or axle that it drives." "power train." *Merriam-Webster Online Dictionary*. 2018. https://www.merriam-webster.com/dictionary/power%20train (Oct. 5, 2018).

(*Id.* ¶ 5.)   The Warranty "'covers any repairs needed to correct defects in materials or workmanship of all parts and components of each new Nissan vehicle supplied by Nissan,'" including the engine, transmission, drivetrain, and restraint system.  (*Id.* ¶ 6.)

Knotts alleges that unbeknownst to him and the putative class members, the subject vehicles' CVTs were "defective," and routinely failed during and shortly after the expiration of the Warranty.  (*Id.* ¶ 7.)  The alleged defect causes the vehicle to lose most, if not all, of its ability to accelerate, putting the vehicle's occupants at serious risk of harm.  (*Id.*)   As a result of this defect, Plaintiff alleges that NNA's CVTs fail after "an unreasonably low number of miles have been driven"—frequently just after the expiration of the Warranty.  (*Id.* ¶ 19.)

Knotts contends that on one occasion, he was stopped at a red light, and when he attempted to accelerate across the intersection after the light turned green, his vehicle "would not accelerate beyond a crawl, causing him to block and delay traffic behind him and rendering him barely able to move the car into the shoulder of the road so that he could avoid the danger of moving so slowly at a traffic-heavy intersection."  (*Id.* ¶ 38.)

After this incident, Plaintiff alleges that his "acceleration problems were pervasive," and in or about March 2017—approximately four and a half years after he purchased his Versa—he took his vehicle to Victory Auto Service & Glass in Brooklyn Park, Minnesota. (*Id.* ¶ 39.)  At that time, the mechanic diagnosed a "fuel injection issue" as the cause of the Versa's problems.  (*Id.*)   The following month, when Knotts' vehicle again failed to accelerate, it was again towed to Victory Auto Service & Glass.  (*Id.* ¶ 40.) This time, the

shop identified a transmission problem, and replaced the transmission and the transmission fluid. (*Id.*) Plaintiff paid more than $3,300 for this work. (*Id.* ¶ 42.)

At the end of April 2017, Plaintiff contacted NNA about his allegedly defective CVT, describing the acceleration problems. (*Id.* ¶ 41.) He alleges that NNA refused to cover the cost of the repairs because the issue arose outside of the Warranty period and the repairs had been performed by non-Nissan service providers. (*Id.* ¶ 42.)

Knotts alleges that he and other putative class members relied on NNA's representations. (*Id.* ¶ 9.) He states that had they known about the alleged defect when they leased or purchased the vehicles, they would have not purchased or leased them, or they would have paid less. (*Id.*) He also contends that he, along with the putative class members, "reasonably expected that the CVTs in the Subject Vehicles would not be defective," and that "if they were defective, Nissan would repair the defect pursuant to the terms of the Warranty." (*Id.* ¶ 20.) Plaintiff maintains that the CVT defect, related safety concerns, and the lack of a pre-failure fix are "material facts to a reasonable consumer" in deciding whether to purchase or lease a Nissan and how much to pay for it. (*Id.* ¶ 26.) He asserts that "Nissan should have disclosed these material facts to the public, but failed to do so." (*Id.*)

Knotts imputes knowledge of the CVTs' alleged defects to NNA, including the knowledge that the CVTs were "not fit for their intended purpose, and unsafe when used as intended." (*Id.* ¶ 8.) According to Plaintiff, "any type of meaningful pre-production testing conducted by Nissan would have provided Nissan with knowledge of the defect." (*Id.*

¶ 22.)  In addition, Knotts alleges that NNA's knowledge of the alleged defect further increased once the subject vehicles were on the market:

> Nissan was further put on notice regarding the existence of the defect shortly after the Vehicles were brought to market (and prior to many Subject Vehicles being sold) as a result of receiving customer complaints (1) directly, (2) through its authorized dealers, (3) through complaints made to the National Highway Traffic Safety Administration ("NHTSA"), and (4) through the public dissemination of complaints publicly posted on online forums.

(*Id.*)

In the Complaint, Knotts quotes 18 complaints filed with the NHTSA involving acceleration failures in 2012 Nissan Versas.  (*Id.* ¶ 22 (a)–(r).)  For example, in one such complaint, the driver reported that on two occasions, his 2012 Nissan Versa stalled when he was driving at approximately 55 miles per hour.  (*Id.* ¶ 22(a).)  The driver further stated that this required two repairs, including transmission replacement, but the failure recurred after each repair.  (*Id.*)  In addition to the NHTSA complaints, Plaintiff also alleges that the Internet is rife with similar complaints, and provides six examples in his pleading.  (*Id.* ¶ 24(a)–(f).)

Knotts asserts that despite these consumer complaints, NNA "failed to disclose the defective CVT to Plaintiff and the Class members, both before and after purchase." (*Id.* ¶ 8.)  Plaintiff asserts that "[a]t all relevant times, Nissan had exclusive possession of the information regarding the defective CVT and its propensity to fail and malfunction based upon, inter alia, Nissan's own testing, industry testing, and the numerous consumer complaints it received." (*Id.* ¶ 28.)  Moreover, Plaintiff further alleges that NNA has "no viable fix for the CVT defect," other than transmission replacement, after the failure

manifests. (*Id.* ¶ 25.) The cost of the defect, Knotts asserts, "has been borne by Plaintiff and Class members." (*Id.*)

## B. Procedural Posture

Plaintiff initiated this putative class action on November 7, 2017, "on behalf of all current and former owners and lessees of model year[] 2012 . . . Nissan Versas that are equipped with a continuously variable automatic transmission."[2] (*Id.* ¶ 1.) Plaintiff proposes the following classes:

> **National Class**: All current and former owners and lessees of the Subject Vehicles purchased or leased in the United States.

> **Minnesota Class**: All current and former owners and lessees of the Subject Vehicles purchased or leased in the State of Minnesota.

(*Id.* ¶ 44.)

Knotts asserts three Minnesota statutory claims on behalf of a putative Minnesota Class. In Counts I and II, Knotts asserts deceptive trade practices claims under the Minnesota Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. § 325D.44, *et seq.* (*Id.* ¶¶ 55–63), and § 325F.68. (*Id.* ¶¶ 64–74.) In Count III, he asserts violations of the Minnesota False Statement in Advertising Act ("MFSAA"), Minn. Stat. § 325F.67. (*Id.* ¶¶ 75–83.)

In Counts IV through VII, Knotts asserts common law claims on behalf of the both the putative national and Minnesota classes. In Count IV, he asserts a claim for breach of

---

[2] While the Complaint also includes the owners and lessees of 2013 Nissan Versas, (Compl. ¶¶ 1, 44), Knotts clarifies that the proposed class references to "subject vehicles" concerns only 2012 Nissan Versas. (Pl.'s Mem. in Opp'n to Mot. to Dismiss at 3 n.1 [Doc. No. 30].) He reserves the right to amend the class definition to include owners and lessees of the 2013 model should discovery provide a basis to do so. (*Id.*)

express warranty, (*id.* ¶¶ 84–92), in Count V, he asserts a claim for breach of the implied warranty of merchantability and fitness, (*id.* ¶¶ 93–101), in Count VI, he asserts a claim of fraudulent misrepresentation, concealment, and failure to disclose, (*id.* ¶¶ 102–09), and in Count VII, Knotts pleads an alternative claim of unjust enrichment. (*Id.* ¶¶ 110–14.)

In its Motion to Dismiss, NNA argues that Plaintiff's claims fail to state a claim upon which relief can be granted for several reasons, including the following: (1) the express warranty claim fails because Knotts does not allege that his vehicle was defective in materials or workmanship; (2) the implied warranty claim fails because Knotts' 2012 Versa successfully performed its ordinary function for the duration of the express warranty; (3) there can be no claim for unjust enrichment because there is an express contract between the parties; (4) Plaintiff's common law fraudulent misrepresentation claim does not allege an actionable misrepresentation that Knotts relied upon, nor does he allege that NNA had fiduciary obligations to him or was otherwise obliged to make disclosures to him under Minnesota law; (5) the MFSAA claim fails because Knotts does not identify any advertisement that he saw, heard, or relied upon; (6) the MDTPA claim in Count I fails because Knotts pleads no facts that would support injunctive relief; and (7) Knotts' statutory claims in Counts I through III fail because he alleges no public benefit. (*See* Def.'s Mem. Supp. Mot. Dismiss ("Def.'s Dismiss Mem.") at 2–3 [Doc. No. 18].)

In its Motion to Strike, NNA moves to strike, or in the alternative, to dismiss, the nationwide-class definition and accompanying allegations set forth in paragraphs 44–51 of the Complaint. (Def.'s Mem. Supp. Mot. to Strike ("Def.'s Strike Mem.") at 1 [Doc. No. 24].) NNA argues that the Court lacks personal jurisdiction over it "as to the claims of

absent members of the putative class who did not purchase their automobiles in Minnesota and whose claims lack a sufficient connection with Minnesota to allow them to be adjudicated in a court of this state."  (*See id.*)

## II.     DISCUSSION

### A.     Motion to Dismiss

#### 1.     Standard of Review

When evaluating a motion to dismiss under Rule 12(b)(6), the Court assumes the facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the plaintiff.  *Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). The Court, however, need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions that plaintiffs draw from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).  A complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

When considering a motion to dismiss under Rule 12(b)(6), "the court generally must ignore materials outside the pleadings." *Porous Media Corp. v. Pall Corp*., 186 F.3d 1077, 1079 (8th Cir.1999). Courts may, however, "consider some materials that are part of the public record or do not contradict the complaint as well as materials that are necessarily embraced by the pleadings." *Id.* (quotations and citation omitted); *see also Illig v. Union Elec. Co*., 652 F.3d 971, 976 (8th Cir. 2011) ("In addressing a motion to dismiss, the court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." (quotation omitted)). "[D]ocuments 'necessarily embraced by the complaint' are not matters outside the pleading," *Enervations, Inc. v. Minn. Mining & Mfg. Co*., 380 F.3d 1066, 1069 (8th Cir. 2004), and courts have discretion "to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion." *Stahl v. United States Dep't of Agric.*, 327 F.3d 697, 701 (8th Cir. 2003) (quotation omitted). Because the Complaint frequently refers to and cites the Warranty, the Court considers the Nissan 2012 Warranty Information Booklet [Doc. No. 19-1], filed as Exhibit A to the Declaration of S. Vance Wittie [Doc. No. 19], to be a document that is necessarily embraced by the pleadings.

## 2. Breach of Express Warranty

Defendant argues that Plaintiff's claim for breach of express warranty should be dismissed for the following reasons: (1) Knotts fails to plead a defect in materials and workmanship, (Def.'s Dismiss Mem. at 7–8); (2) he does not show that NNA breached its repair promise, (*id.* at 8–9); (3) the warranty limitations are not unconscionable, (*id.* at 9–11); and (4) NNA was not required to pay for third-party repairs. (*Id.* at 12.) NNA

contends that its Warranty does not promise that its vehicles or any of the components are free of defects, but rather provides only that it "will repair or replace components that are defective in materials or workmanship within the applicable time and mileage limitations"—that is, five years or 60,000 miles, whichever comes first—and requires consumers to take their vehicles to an authorized dealer for repairs. (*Id.* at 6–7) Therefore, according to Defendant, to plead a breach of this express warranty, Plaintiff must show that "(1) the vehicle had a defect in materials and workmanship; (2) he sought a repair from a Nissan dealer while the warranty was in effect; and (3) the dealer failed or refused to perform the repair." (*Id.* at 7.) Defendant contends that Plaintiff's claim does not sufficiently assert these allegations. (*Id.*)

Under Minnesota law, a claim for breach of an express warranty must contain the following elements: (1) the existence of a warranty; (2) a breach; and (3) a causal link between the breach and the alleged harm. *Sipe v. Workhorse Custom Chassis, LLC*, 572 F.3d 525, 530 (8th Cir. 2009) (citing *Peterson v. Bendix Home Sys., Inc.*, 318 N.W.2d 50, 52–53 (Minn. 1982)). There appears to be no dispute that a warranty between Knotts and NNA existed for some period of time, although the parties dispute whether Knotts complied with its terms, whether it remained in effect at the relevant time, and whether it was unconscionable.

As noted, the Warranty provides basic coverage for 36 months or 36,000 miles, whichever comes first, and powertrain coverage for 60 months or 60,000 miles, whichever comes first. (Wittie Decl., Ex. A (Nissan 2012 Warranty Info. Booklet at 6).) The powertrain coverage specifically states that it applies to the transmission. (*Id.*) As to

both the general and powertrain-specific warranties, coverage is provided for "any repairs needed to correct defects in materials or workmanship." (*Id.*) While the Warranty covers certain repairs at no charge to the vehicle owner, it expressly provides that "[y]ou must take the vehicle to an authorized Nissan dealer in the United States during regular business hours at your expense in order to obtain warranty service." (*Id.* at 7.) The Warranty contains no language that refers to reimbursement for third-party repairs.

The Court first considers NNA's argument concerning Knotts' failure to allege that he sought repair from NNA or an authorized Nissan dealer. (Def.'s Dismiss Mem. at 8–9.) Plaintiff asserts that the Warranty's limitations regarding place of service, time, and mileage are unconscionable in light of "Defendant's knowledge of the defective CVT, the lack of any solution to the problem, the fact that the defect tends to manifest just barely outside the Warranty period, and Defendant's refusal to honor the Warranty when Plaintiff or class members had any prior repair work completed at a non-Nissan repair shop." (Compl. ¶ 36.)

The Court agrees that if NNA had knowledge of the alleged defect and its delayed manifestation, the Warranty's timing and mileage limitations could plausibly be considered unconscionable, but the same is not true of the requirement that service be provided by an authorized Nissan dealer. Unlike timing-related limitations, the requirement that Nissan-authorized dealers perform repairs under the Warranty lacks a relationship to NNA's alleged knowledge of a delayed manifestation of defect. The Court thus finds the allegation of unconscionability as to the place-of-service requirement

to be implausible. Accordingly, Plaintiff's breach of warranty claim must allege compliance with the terms of the Warranty.

Knotts, however, does not allege that he presented his vehicle to an authorized Nissan dealer for repair and that the dealer refused to comply with the warranty. To the contrary, he asserts that he took his vehicle to Victory Auto Service & Glass, which is unaffiliated with NNA. (*Id.* ¶¶ 39–40.) Knotts alleges that when he contacted NNA after the repairs had been performed by Victory Auto Service & Glass, NNA informed him that the cost of repairs was not covered by the Warranty because the issues arose outside of the Warranty period and the repairs were performed "by service providers other than Nissan." (*Id.* ¶ 41.)

NNA cannot have breached the Warranty if Knotts did not submit his vehicle to a Nissan-authorized dealer for repair. *See Kearney v. Bayerische Motoren Werke Aktiengesellschaft*, Civ. No. 17-13544 (WHW-CLW), 2018 U.S. Dist. LEXIS 147746, at *45 (D.N.J. Aug. 29, 2018) (granting motion to dismiss breach of express warranty claim where plaintiffs did not allege that they presented their vehicles to BMW for repair, as required by the warranty). NNA's motion to dismiss Plaintiff's breach of express warranty claim (Count IV) is therefore granted on this basis. Because Knotts did not take his vehicle to a Nissan-authorized dealer, re-pleading would be futile. Accordingly this claim is dismissed with prejudice. Because the Court finds that Plaintiff fails to state a claim for breach of express warranty on this basis, it does not address Defendant's additional arguments for dismissal of this claim.

### 3. Breach of Implied Warranty

In the Complaint, Plaintiff alleges that NNA impliedly warranted that its CVTs were not inherently defective, were of good and merchantable quality, and were fit for the ordinary purposes for which they were sold. (Compl. ¶ 95.) He asserts that NNA breached the warranty because the vehicles were "prone to substantial failure and malfunction, pose serious safety concerns," and have "substantially failed and malfunctioned." (Id.¶ 97.)

Defendant argues that Plaintiff's claim for breach of implied warranty fails for two reasons. First, it contends that the claim does not allege a defect that manifested within the time and mileage limits of the express warranty. (Def.'s Dismiss Mem. at 12.) Second, NNA asserts that Plaintiff's vehicle was merchantable as a matter of law. (*Id.*)

An implied warranty of merchantability requires that goods be "fit for the ordinary purposes for which such goods are used." *Daigle v. Ford Motor Co.*, 713 F. Supp. 2d 822, 826 (D. Minn. 2010). An implied warranty of merchantability is breached on a showing that a "'product is defective to a normal buyer making ordinary use of the product.'" *Thunander v. Uponor, Inc.*, 887 F. Supp. 2d 850, 860 (D. Minn. 2012) (quoting *Driscoll v. Standard Hardware, Inc.*, 785 N.W.2d 805, 816 (Minn. Ct. App. 2010)).

Under Minnesota law, a written implied warranty of merchantability may be excluded or modified by using language that mentions merchantability and is conspicuous. Minn. Stat. § 336.2-316(2). Here, the Warranty mentions merchantability in all capital letters, stating, "ANY IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE SHALL BE LIMITED TO THE DURATION OF THIS WRITTEN WARRANTY." (Wittie Decl., Ex. A (Nissan 2012

Warranty Info. Booklet at 6).)   This language is found within a rectangular box under the heading "LIMITATION OF WARRANTIES AND OTHER WARRANTY TERMS AND STATE LAW RIGHTS," and precedes the express warranty terms.  (*Id.*)  In light of this language, Defendant asserts that for Knotts to sufficiently plead a breach of the implied warranty of merchantability, he must plead that his vehicle was not merchantable before it reached the 60,000 mile limit of the express warranty.  (Def.'s Dismiss Mem. at 12.)

In addition, NNA argues that the out-of-warranty mileage of Plaintiff's vehicle affirmatively renders it merchantable as a matter of law.  (*Id.* at 13.)  NNA contends that "where the facts show that the vehicle was driven for a substantial period of time or for a substantial number of miles without serious problems, courts have concluded that the vehicle is merchantable as a matter of law."  (*Id.* at 13) (citing *Stevenson v. Mazda Motor of Am., Inc.,* No. 14-cv-5250 (FLW) (DEA), 2015 WL 3487756, at * 13 (D. N.J. June 2, 2015); *Szymczak v. Nissan N. Am., Inc.*, No. 10 CV 7493 (VB), 2011 WL 7095432, at *11 (S.D.N.Y. Dec. 16, 2011)).  The Court disagrees.  As Knotts notes, the court in *Stevenson* observed that this holding is "not universal," as in cases in which unexpected transmission failure creates acceleration failure—precisely what Plaintiff alleges here.   2015 WL 3487756, at *13 (citing *Henderson v. Volvo Cars of N. Am., Inc.*, Civ. No. 09-4146 (DMC) (JAD), 2010 U.S. Dist. LEXIS 73624 (D.N.J. July 21, 2010)); *see also Kearney*, 2018 U.S. Dist. LEXIS 147746, at *48 (rejecting auto manufacturer's argument that its vehicle was merchantable simply because the plaintiff still drove it).

And, as noted, Plaintiff alleges that his claims should survive the pleading stage because he has plausibly pled that the Warranty's mileage and temporal limitations are

unconscionable.  (*See* Compl. ¶ 33.)  Knotts contends that the Warranty is unconscionable in two respects: (1) substantively, because NNA was aware, prior to the sale of the vehicle, of defects in the CVTs; and (2) procedurally, because NNA "unilaterally imposed durational and damage limits" in the Warranty, without affording Plaintiff or the putative class members any bargaining authority.  (*Id.* ¶¶ 33–34.)

"Where the alleged breach involves a latent defect that manifests outside the period covered by the warranty, a plaintiff may sometimes state a claim if he alleges that the warranty was unconscionable."  *Kearney*, 2018 U.S. Dist. LEXIS 147746, at * 48 (citing *Henderson,* 2010 U.S. Dist. LEXIS 73624, 2010 WL 2925913, at *7).  In *Kearney*, on a motion to dismiss a claim for a breach of the implied warranty of merchantability, the court declined to resolve an unconscionability claim where:  (1) the plaintiffs alleged that BMW was aware of a defect in its sunroofs by the time the plaintiffs had purchased their vehicles and had sole knowledge of the defect; (2) that there was "gross disparity in bargaining power" between the plaintiffs and defendants; and  (3) that the defendants, not the plaintiffs, had determined the warranty's time limitations.  *Id.*  Under such circumstances, the court found it necessary to give the parties an opportunity to obtain discovery regarding those issues.  *Id.*  Here, Knotts makes similar allegations concerning NNA's knowledge of the alleged defect, (Compl. ¶¶ 22–32, 34), the parties' differences in bargaining power, (*id.* ¶ 33), and that NNA had unilaterally determined the scope of the Warranty.  (*Id.* ¶ 33.)

Although in the context of an express warranty breach claim, in *Podpeskar v. Makita U.S.A. Inc.*, this Court permitted a plaintiff's claim to proceed past the motion-to-dismiss stage, finding that the plaintiff had pleaded sufficient facts regarding unconscionability.  247

F. Supp. 3d 1001, 1009 (D. Minn. 2017) (citing *Hagen v. McAlpine & Co.*, No. 14-1095 (DWF/LIB), No. 14-1095, 2015 WL 321428, at *3–4 (D. Minn. Jan. 26, 2015)). Notably, the plaintiff had alleged that the product failed due to a defective design of which the manufacturer had knowledge. *Id.*

Here, the Court similarly finds that Knotts has pleaded sufficient facts to plausibly allege unconscionability and grants him the opportunity to obtain discovery concerning this issue.

### 4. Unjust Enrichment

A plaintiff asserting a claim of unjust enrichment "must establish an implied-in-law or quasi-contract in which the defendant received the benefit of value that unjustly enriched the defendant in a manner that is illegal or unlawful." *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012). Knotts alleges that NNA was unjustly enriched by accepting payment for the purchase of the subject vehicles, with full knowledge that the purchasers "were not receiving products of the quality, nature, fitness, or value that had been represented" by NNA. (Compl. ¶¶ 111–12.)

Defendant argues that Plaintiff's claim for unjust enrichment fails. (Def.'s Dismiss Mem. at 16–18.) It argues that as an equitable remedy, unjust enrichment is not available where there is an adequate remedy at law—namely, Plaintiff's warranty-based claims. (*Id.* at 18.) Additionally, NNA contends that because Knotts purchased his vehicle from a dealer, and not directly from NNA, Knotts did not confer a benefit on NNA. (*Id.*) Finally, NNA contends that it has also not received a benefit for which it should pay "in equity and

good conscience." (*Id.*) (citing *Luckey v. Alside, Inc.*, 245 F. Supp. 3d 1080, 1083 (D. Minn. 2017)).

The Rules allow for pleading claims for relief in the alternative. Fed. R. Civ. P. 8(a)(3). Although a party may not ultimately recover on both breach of contract and unjust enrichment claims, it may pursue these alternative theories until it is conclusively decided "that a valid and enforceable contract exists between the parties which governs the specific dispute before the court." *Spectro Alloys Corp. v. Fire Brick Engineers Co.*, 52 F. Supp. 3d 918, 932 (D. Minn. 2014). Here, Knotts clearly asserts his claim for unjust enrichment in the alternative. (*See* Compl., Count VII ("Unjust Enrichment—Pled in the Alternative").) He avers that simply because he pleads a viable claim for a breach of the implied warranty of merchantability does not foreclose his ability to plead an alternative claim of unjust enrichment. (*See* Pl.'s Opp'n to Dismiss at 22.)

Although the parties do not appear to dispute that Knotts' Nissan was subject to a warranty for at least some period of time, the Court has made no finding to this effect. If and when such a finding is made, likely on summary judgment, Knotts' unjust enrichment claim will be dismissed, but not until then.

The Court is likewise not inclined, at this stage, to find that Plaintiff's unjust enrichment claim fails due to Plaintiff purchasing his vehicle from an authorized Nissan dealer, as opposed to NNA itself, or because NNA did not receive a benefit for which it should pay in equity and good conscience. NNA cites *Luckey v. Alside, Inc.,* 245 F. Supp. 3d at 1084, for the proposition that Plaintiff did "demonstrate how the money he paid for the vehicle ended up in NNA's hands." (Def.'s Dismiss Mem. at 18.) In *Luckey*, home

buyers purchased from housing developers new homes that contained windows manufactured by the defendant, Alside. 245 F. Supp. 3d at 1084. Alleging that the windows suffered from corrosion and condensation, the plaintiffs brought multiple claims against Alside, including unjust enrichment. *Id.* at 1084–85. The court found that the plaintiffs' unjust enrichment claim failed, stating, "Plaintiffs have not shown how any money they paid for their windows indirectly ended up in Alside's hands in the form of profits, since the facts pled imply that Alside would have been paid for the windows before and unrelated to Plaintiffs' purchase of the windows from third parties." *Id.* at 1099. The Court finds the facts here distinguishable. Knotts purchased his 2012 Versa from an authorized Nissan dealer, which bears a much closer financial relationship to NNA, the defendant here, than the attenuated relationship between the housing developers and Alside, the window-manufacturer defendant in *Luckey*. (Compl. ¶ 13.) The Court does not find this connection so attenuated as to warrant dismissal of the unjust enrichment claim on a motion to dismiss.

In addition, Plaintiff has sufficiently pleaded that NNA obtained a benefit that unjustly enriched it in a manner that is illegal or unlawful, *see Caldas*, 820 N.W.2d at 838, by alleging that NNA "profited and benefited" from the Plaintiff's and prospective class members' purchase of vehicles. (Compl. ¶ 111.) And, Plaintiff alleges that NNA "voluntarily accepted and retrained these profits and benefits . . . with full knowledge and awareness that, as a result of its misconduct, Plaintiff and the Class members were not receiving products of the quality, nature, fitness, or value that had been represented by

[NNA]."  (*Id.* ¶ 112.)  Because Knotts sufficiently pleads this alternative claim, Defendant's

motion to dismiss Plaintiff's unjust enrichment claim is denied.

### 5.  Fraudulent Misrepresentation, Concealment, and Failure to Disclose

Defendant argues that Plaintiff's claim for fraudulent misrepresentation,

concealment, and failure to disclose fails because Plaintiff does not plead this claim with the

requisite specificity.  (Def.'s Dismiss Mem. at 14–16.)

In Minnesota, a claim for fraudulent misrepresentation requires:

> (1) a false representation by [the defendant] of a past or existing material fact
> susceptible of knowledge; (2) made with knowledge of the falsity of the
> representation or made without knowing whether it was true or false; (3) with
> the intention to induce [the plaintiff] to act in reliance thereon; (4) that the
> representation caused [the plaintiff] to act in reliance thereon; and (5) that [the
> plaintiff] suffered pecuniary damages as a result of the reliance.

*Valspar Refinish, Inc. v. Gaylord's, Inc.,* 764 N.W.2d 359, 368 (Minn. 2009).  Claims of

fraud must be pled with particularity.  Fed. R. Civ. P. 9(b).  In order to provide the notice

required under Rule 9(b), a plaintiff must plead "the who, what, when, where, and how" of

the alleged fraud. *Summerhill v. Terminix, Inc*., 637 F.3d 877, 880 (8th Cir. 2011).

"Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not

sufficient to satisfy [Rule 9(b)]."  *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917

(8th Cir. 2007).

Plaintiff's pleading satisfies some of the elements for a fraudulent misrepresentation

claim by alleging that:  (1) NNA made false representations on its website, claiming that

CVTs provided "smoother performance" and "quicker acceleration," (Compl. ¶ 3); (2) NNA

knew of the alleged CVT defect after bringing the vehicles to market, through customer and

dealer complaints, and complaints made to the NHTSA and other online forums, (*id.* ¶¶ 22, 28); (3) Plaintiff relied on NNA's misrepresentations, or he would not have purchased his vehicle, (*id.* ¶¶ 9, 26–29, 106–07); and (4) as a result of reliance, Plaintiff suffered a monetary loss. (*Id.* ¶¶ 29, 42–43.)

Plaintiff does not plead, however, that NNA intended to induce Knotts to rely on its allegedly false statements. *See Valspar*, 764 N.W.2d at 368. And Knotts offers only a conclusory allegation that NNA knew of the alleged CVT defect prior to bringing the subject vehicles to market, essentially speculating that "any type of meaningful pre-production testing" conducted by NNA would have revealed the defect.[3] (Compl. ¶ 22.) While he alleges that NNA "had exclusive possession of the information regarding the defective DVT and its propensity to fail" based on NNA's own testing and industry testing, (*id.* ¶ 28), he does not point to any specific testing or explain how it would have demonstrated the alleged defect. *See Beck v. FCA US LLC*, 273 F. Supp. 3d 735,753 (E.D. Mich. 2017) (finding allegations about testing insufficient to support inference that the defendant knew about the alleged design defect at time of sale); *Grodzitsky v. Am. Honda Motor Co., Inc.*, No. 2:12-cv-1142-SVW-PLA, 2013 WL 690822, at *6 (C.D. Cal. Feb. 19, 2013) (holding that a reference to non-specific pre-release testing data and "aggregate data from Honda dealers" did not suggest how the information would have revealed the defect at the time of sale). The Court finds that Plaintiff's current claim does not state the necessary elements of fraudulent misrepresentation, concealment, and failure to disclose. However,

---

[3] The Court finds that Plaintiff has sufficiently pleaded facts alleging NNA's knowledge of the alleged defect after the 2012 Versas were brought to market. (*See* Compl. ¶¶ 23–24.)

because an amended pleading could correct these deficiencies, the claim is dismissed without prejudice.

### 6.    Minnesota False Advertising Statute

In support of his claim under the MFSAA, Minn. Stat. § 325F.67, Knotts asserts that NNA:  (1) made "fraudulent, misleading, and deceptive statements relating to the true characteristics, standards, quality, and grade of the CVTs and the Vehicles"; (2) made "misrepresentations by omission, of information about the defective nature of the CVTs in the Vehicles, the improper design of the CVTs in the Vehicles, and Defendant's knowledge of those defects"; and (3) concealed the nature of the "defective CVTs in the Vehicles." (Compl. ¶ 79.)

Under the MFSAA, it is a misdemeanor to circulate advertisements that contain "any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading."  Minn. Stat. § 325F.67.   A person injured because of a violation of this statute may bring a civil action and recover money damages. Minn. Stat. § 8.31; *see also LensCrafters, Inc. v. Vision World, Inc*., 943 F. Supp. 1481, 1491 (D. Minn. 1996). Because, as alleged in the Complaint, this claim sounds in fraud, the particularity requirements of Rule 9(b) also apply to this claim.  *Russo v. NCS Pearson, Inc.,* 462 F. Supp. 2d 981, 1003 (D. Minn. 2006).   Pleading the "who, what, when, where and how" of the alleged advertising fraud requires the identification of an advertisement disseminated to the public in Minnesota.  *Id.*

Defendant contends that Plaintiff's claim under the MFSAA fails for the following reasons:  (1) Plaintiff fails to identify a particular advertisement, (Def.'s Dismiss Mem. at

18–19); (2) the representations on which Plaintiff relies are not actionable, but were mere puffery, (*id.* at 19–21); (3) Plaintiff lacks standing because he does not plead reliance, (*id.* at 21–22); and (4) Plaintiff fails to allege that the advertisement in question occurred in Minnesota. (*Id.* at 22.)

In the Complaint, Plaintiff identifies NNA's website as the source of an advertisement, noting that there, NNA "advertised and continues to advertise CVTs on its website as a 'next-generation' transmission, designed to 'provide smoother performance, quicker acceleration, and better fuel economy than ever before.'" (Compl. ¶ 3) (citing Nissan, Performance, https://www.nissanusa.com/cars/versa-sedan/versions-specs/version.1-6-s-plus.html). To the extent that Plaintiff intends to allege that NNA made affirmative, deceptive statements through this allegation, it arguably satisfies the "how" requirement under Rule 9(b). *See Luckey*, 245 F. Supp. 3d at 1097 (stating that "an allegation that information is widely available on a website" can satisfy some aspects of Rule 9(b)). However, Knotts fails to identify whether he viewed it, when he viewed it, and whether he viewed it in Minnesota. *See Russo*, 462 F. Supp. 2d 1003. And while the reference to NNA's website appears in the third paragraph of the Complaint, in the Count III-specific allegations, Plaintiff does not identify any specific statements. Thus, to the extent that Plaintiff intends to plead an affirmative, deceptive statement in violation of the MFSAA, his current pleading is insufficient.

Knotts also alleges false advertising by omission. (Compl. ¶ 79(b).) This Court evaluated a claim of negligent misrepresentation by omission—to which the heightened pleading requirements of Rule 9(b) again apply—in *In re Target Corporation Customer*

*Data Security Breach Litigation*, 64 F. Supp. 3d 1304 (D. Minn. 2014). In this context of misrepresentation by omission, the Court noted that Rule 9(b) is satisfied "if the omitted information is identified" and the complaint states "'how or when' the concealment occurred." *Id.* at 1311 (citations omitted). The Complaint here sufficiently identifies the allegedly omitted information as "information about the defective nature of the CVTs in the Vehicles, and Defendant's knowledge of those defects." (Compl. ¶ 79(b).) As with Plaintiff's allegations concerning affirmatively false advertisements, the Court assumes that NNA's website is the source of the allegedly false-by-omission advertisements. (*See id.* ¶ 3.) But again, the Complaint fails to identify whether Plaintiff viewed it, when he viewed it, and if he viewed it in Minnesota.

NNA also argues that the statement in question constitutes non-actionable "puffery." (Def.'s Dismiss Mem. at 20.) Puffery consists of "exaggerated blustering or boasting and vague, subjective statements of superiority." *Bernstein v. Extendicare Health Servs., Inc.*, 607 F. Supp. 2d 1027, 1031 (D. Minn. 2009) (citations omitted). Such statements are typically general and vague. *Moua v. Jani-King of Minn., Inc.*, 810 F. Supp. 2d 882, 890 (D. Minn. 2011). For instance, in *Moua*, this Court found that statements that a franchise was a "good business" that would be around for "a long time," were puffery. *Id.* The Court finds that the affirmative statements here—that CVTs provide smoother performance, quicker acceleration, and better fuel economy, (Compl., ¶ 3)—are subjective statements that are not so vague or general as to constitute puffery. *See Nat'l Mulch & Seed, Inc. v. Rexius Forest By-Prod. Inc*., 2:02-CV-1288, 2007 WL 894833, at *19 (S.D. Ohio Mar. 22, 2007)

(noting that affirmations that express an objective fact "go beyond puffing," such as a statement that a transmission is "in good working order.").

Defendant also argues that Plaintiff lacks standing because he fails to plead reliance. (Def.'s Dismiss Mem. at 21–22.) A plaintiff seeking damages under Minn. Stat. § 8.31, subd. 3a, for violations of Minn. Stat. § 325F.67, need not plead "individual consumer reliance on the defendant's wrongful conduct." *Group Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 13 (Minn. 2001). Rather, as an element of causation, the consumer "must establish a causal nexus between their alleged damages and the conduct of the defendants alleged to violate the statutes." *Id.* at 15. Here, as noted, Knotts does not allege that he viewed the advertisement, much less whether he viewed it prior to purchasing his car, and whether a causal link existed between the two.

Finally, NNA argues that Plaintiff fails to allege that the advertisement occurred in Minnesota. (Def.'s Dismiss Mem. at 22.) Under the MFSAA, the alleged false statement must occur "in this state." Minn. Stat. § 325F.67. Because the Complaint fails to allege that the false statement occurred in Minnesota, the claim fails for this additional reason.

In short, the Court finds that Plaintiff's claim for relief under the MFSAA fails to state a claim on which relief may be granted. However, because these deficiencies may be cured through re-pleading, the Court dismisses this claim without prejudice.

### 7. Injunctive Relief Under the Minnesota Deceptive Trade Practice Act

NNA moves to dismiss Plaintiff's claim under the MDTPA, Minn. Stat. § 325D.44, in Count I of the Complaint. It argues that claims brought under this statute only permit

injunctive relief, and Knotts has not alleged any facts showing that he is at risk of future harm.  (Def.'s Dismiss Mem. at 3.)

Under the MDTPA, "[a] person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable."  Minn. Stat. § 325D.45, subd. 1.  A party seeking relief under the MDTPA must demonstrate a likelihood of future harm because the statute provides relief only "from future damage, not past damage."  *Gardner v. First Am. Title Ins. Co.*, 296 F. Supp. 2d 1011, 1020 (D. Minn. 2003).

Plaintiff alleges that NNA violated the MDTPA by representing that its CVTs and subject vehicles were of a particular standard or quality when they were, in fact, defective.  (Compl. ¶ 56.)  He asserts that this created a misunderstanding among Plaintiff and the putative class members regarding the quality and longevity of the CVTs and the vehicles. (*Id.*)  In addition, Plaintiff alleges that NNA continues to market and advertise the subject vehicles and CVTs to the public despite NNA's knowledge of the known defects.  (*Id.* ¶¶ 3, 18.)  Plaintiff further argues that it is highly likely that current and future lessees and owners will need to repair the vehicles' transmissions in the future, and cannot rely on NNA's statements regarding the vehicles' safety.  (Pl.'s Opp'n to Dismiss at 35.)  As for Knotts himself, he asserts that he is likely to be harmed in the future because he has no way of knowing if NNA has fixed the defective transmissions, whether his CVT will fail again, and whether NNA would replace it with another defective transmission.  (*Id.*)

A plaintiff asserting a claim under the MDTPA must allege an irreparable injury or threat of future harm in order to withstand a motion to dismiss.  *See Johnson v. Bobcat Co.*,

175 F. Supp. 3d 1130, 1141 (D. Minn. 2016) (dismissing the plaintiff's MDTPA claim where all of the allegations were based on past damage). The Court finds that Knotts has alleged a risk of future harm sufficient to assert standing under the MDTPA and to withstand a motion to dismiss. *See Hudock v. LG Elec. U.S.A., Inc.*, No. 16-cv-1220 (JRT/FLN), 2017 U.S. Dist. LEXIS 44681, at *15 (D. Minn. Mar. 27, 2017) (finding allegations stating that "there is no way to know when or if Defendants have ceased misrepresenting the refresh rates" and "Plaintiffs remain in the market for televisions" were sufficient to demonstrate standing for injunctive relief under the MDTPA). Knotts seeks injunctive relief, (Compl., Prayer for Relief at 33 ¶ (d)), alleges that NNA "continues to violate" the MDTPA, (*id.* ¶ 58), "continues to advertise CVTs" on its website, (*id.* ¶ 3), and that the safety risks of the subject vehicles are ongoing. (*Id.* ¶ 27) ("Nissan's failure to disclose and fix the defect in the DVT is especially egregious in light of the safety risks resulting from driving with a defective transmission, including an inability to accelerate[.]") At this early stage of the litigation, these allegations provide a sufficient basis for Plaintiff's MDTPA claim. The Court therefore denies Defendant's motion to dismiss Plaintiff's claim under the MDTPA (Count I).

### 8. Public Benefit for Statutory Consumer Protection Claims

Defendant argues that Plaintiff's statutory claims in Counts I through III, brought pursuant to the Private Attorney General Act, fail because Knotts cannot demonstrate that his causes of action benefit the public. (Def.'s Dismiss Mem. at 22.) Rather, NNA asserts, Plaintiff primarily seeks a remedy of damages. (*Id.* at 23) (citing Compl., Prayer for Relief.)

For a private citizen to seek relief under the statues in question, he or she must demonstrate that the cause of action "protect[s] public rights in the interest of the state." *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000). In order to determine the existence of a public benefit, courts consider the following factors: (1) the degree to which the defendant's alleged misrepresentations affected the public; (2) the form of the alleged representation; (3) the type of relief sought; and (4) whether the alleged misrepresentations are ongoing. *In re Levaquin Prods. Liab. Litig.*, 752 F. Supp. 2d 1071, 1077–79 (D. Minn. 2010).

The Court finds that Plaintiff's allegations sufficiently allege a public benefit. Knotts asserts that NNA has made misrepresentations about the CVTs on its website, (Compl. ¶ 3), that the representations are ongoing, (*id.*), and that public safety is at risk. (*Id.* ¶ 26.) Given that the advertisement is alleged to have appeared online, the Court finds that the alleged misrepresentation may have affected the public to a significant degree. While Plaintiff seeks damages, he also requests injunctive relief. (*Id.*, Prayer for Relief, ¶ (d).) Accordingly, the Court denies Defendant's Rule 12(b)(6) motion on this basis.

**B.    Defendant's Motion to Strike**

Defendant also moves to strike, or in the alternative, to dismiss, the nationwide-class definition and accompanying allegations set forth in paragraphs 44–51 of the Complaint. (Def.'s Strike Mem. at 1.) NNA argues that the Court lacks personal jurisdiction over it "as to the claims of absent members of the putative class who did not purchase their automobiles in Minnesota and whose claims lack a sufficient connection with Minnesota to allow them to be adjudicated in a court of this state." (*See id.*) Therefore, NNA seeks to

strike Plaintiff's "overbroad" nationwide class definition. (*Id.* at 2.) For the reasons discussed below, the Court denies this motion.

### 1. *Bristol-Myers Squibb*

Defendant relies upon the Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773 (2017) ("*BMS*"). *BMS* was a consolidated products liability action filed in California state court. The defendant company was incorporated in Delaware and headquartered in New York. *Id.* at 1777–78. The plaintiffs consisted of 86 California residents and 592 residents of 33 other states. *Id.* at 1778. The nonresident plaintiffs did not allege that their injuries were related to the defendant's conduct in California. *Id.* The California Supreme Court decided that specific personal jurisdiction was proper based on California's unique "sliding scale" approach under which a greater degree of contacts with the state compensates for a lesser degree of relation between those contacts and the allegedly illegal conduct. *Id.*

The United States Supreme Court reversed the California court, overruling their "sliding scale" approach and reaffirming that "[i]n order for a state court to exercise specific jurisdiction, 'the *suit*' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*.'" *Id.* at 1780 (emphasis in original) (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014)). The Court emphasized that joinder with a party who can bring a valid claim is not sufficient for a showing of jurisdiction.

> "[A] defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction." This remains true even when third parties (here, the plaintiffs who reside in California) can bring claims similar to those brought by the nonresidents. . . . What is needed—and what is missing here— is a connection between the forum and the specific claims at issue.

*Id.* at 1781 (quoting *Walden v. Fiore*, 571 U.S. 277, 286 (2014)).

The Court concluded by noting that "since our decision concerns the due process limits on the exercise of specific jurisdiction by a State, we leave open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Id.* at 1783–84. Importantly, the Court did not clarify whether the logic of *BMS* applies to class actions. *See id.* at 1789 n.4 (Sotomayor, J., dissenting) ("The Court today does not confront the question whether its opinion here would also apply to a class action . . . .").

### 2. Whether this Court May Rule on the Motion to Strike Prior to Class Certification

Relying on *BMS*, Defendant contends that a "great majority" of the absent putative nationwide class members will not be Minnesota citizens and will not have acquired their vehicles in Minnesota. (Def.'s Strike Mem. at 2.) Because the Court allegedly lacks jurisdiction over these putative class members, NNA argues, "[i]t is clear from the face of the Complaint that the nationwide class [Plaintiff] advocates cannot be maintained," and therefore striking the class allegations is proper. (Def.'s Strike Reply at 11–12 [Doc. No. 33].)

In response, Knotts argues that class allegations can only fail as a matter of law when they fail to meet Rule 23's requirements, and therefore NNA's personal jurisdiction arguments at this stage—prior to discovery or certification—are effectively irrelevant. (*See* Pl.'s Opp'n to Strike at 8–9 [Doc. No. 29].) Framing NNA's argument in reverse, Plaintiff asserts that because the Complaint adequately alleges the Rule 23 requirements, it is *not*

clear from the face of the Complaint that a class action cannot be maintained, and therefore the motion should be denied. (*Id.*)

In their briefing, the parties do not cite any authority in which a court considered personal jurisdiction over a putative class on a pre-certification motion to strike.[4]  Plaintiff relies on *Wilcox v. State Farm Fire & Casualty Co.*, No. 14-2798 (RHK/FLN), 2016 WL 6908111, at *3, 5 (D. Minn. Sept. 7, 2016), *report and recommendation adopted,* 2016 WL 7200303 (D. Minn. Nov. 1, 2016), for the proposition that "[a] court should deny a motion to strike the class allegations unless it is clear from the face of the complaint that a class action cannot be maintained." *Id.* (citing *Nobles v. State Farm Mut. Auto. Ins. Co.*, No. 10–4175, 2012 WL 4090347, at *2 n.1 (W.D. Mo. Sept. 17, 2012)).  As NNA notes, however, in *Wilcox*, the defendant's motion to strike was granted because a Minnesota Supreme Court decision requiring individual determination of the claims at issue precluded the putative class from meeting Rule 23's predominance requirement.  *See id.* at *5.

Defendant cites *Wilcox* and four other district court cases in which the courts granted motions to strike or dismiss class allegations before certification, on grounds similar to *Wilcox* and unrelated to jurisdictional concerns.  *See In re St. Jude Med. Inc. Silzone Heart Valves Prod. Liab. Litig.,* MDL No. 01-1396 (JRT/FLN), 2009 WL 1789376, at *5 (D. Minn. June 23, 2009) (finding, on third motion for class certification, that evidence was insufficient to support certification under Eighth Circuit precedent, thus motion to strike was

---

[4] As counsel acknowledged at the hearing on this motion, several of the *BMS* cases do, however, consider personal jurisdiction at the pleading stage on a motion to dismiss.  *See, e.g.*, *McDonnell v. Nature's Way Prod., LLC*, No. 16 C 5011, 2017 WL 4864910, at *1 (N.D. Ill. Oct. 26, 2017).

granted); *In re Old Kent Mortg. Co. Yield Spread Premium Litig.,* 191 F.R.D. 155, 164 (D. Minn. 2000) (deciding, prior to ruling on plaintiff's motion for voluntary dismissal, to strike class allegations because the predominance requirement could not be met as a matter of law based on HUD regulation requiring individual determination of rate-setting claims); *Nevada-Martinez v. Ahmad*, No. 5:15-cv-239-JMH, 2016 WL 7888046, at *3 (E.D. Ky. June, 17, 2016) (granting motion to strike because the court could "fathom no potential factual developments which would offer hope of altering its conclusion" that the proposed class was a fail-safe class); *Hall v. Equity Nat'l Life Ins. Co.*, 730 F. Supp. 2d 936, 941-42 (E.D. Ark. 2010) (granting motion to strike because the suit was barred by *res judicata* from nationwide settlement in state court).

District courts in other circuits have increasingly declined to address this particular issue at the pleading stage. *See Gonzalez v. Costco Wholesale Corp.*, No. 16-CV-2590 (NGG) (JO), 2018 WL 4783962, at *8 (E.D.N.Y. Sept. 29, 2018) ("[T]his court will defer its resolution of this issue until Plaintiff files a motion for class certification."); *Gasser v. Kiss My Face, LLC*, No. 17-CV-1675-JSC, 2018 WL 4538729, at * 2 (N.D. Cal. Sept. 21, 2018) ("[A]t this stage of the litigation, where Defendant has brought three motions to dismiss and a motion for judgment on the pleadings, the issue of whether Plaintiffs can and/or should represent consumers outside of New York and California is an issue to be raised at class certification."); *Campbell v. Freshbev LLC*, 1:16-CV-7119(FB)(ST), 2018 WL 3235768, at *2 (E.D.N.Y. July 3, 2018) ("Given the unsettled nature of the law following *Bristol-Myers*, the Court will defer on this question until the plaintiff brings a motion for class certification, if he chooses to do so."); *Chernus v. Logitech, Inc.*, CV 17-

673(FLW), 2018 WL 1981481, at *8 (D.N.J. Apr. 27, 2018) (same); *Weisheit v. Rosenberg & Assocs., LLC*, CV JKB-17-0823, 2018 WL 1942196, at *5 (D. Md. Apr. 25, 2018) (similar); *Blitz v. Monsanto Co.*, No. 17-CV-473-WMC, 2018 WL 1785499, at *2 (W.D. Wis. Apr. 13, 2018) (similar). There is no Eighth Circuit authority on this question, however.

Courts in other jurisdictions have analyzed pre-certification motions to strike under a 12(b)(6) standard, i.e., "[t]he moving party has the burden of demonstrating from the face of the plaintiffs' complaint that it will be impossible to certify the class as alleged, regardless of the facts plaintiffs may be able to prove." *Schilling v. Kenton Cnty., Ky.*, No. CIV.A. 10-143-DLB, 2011 WL 293759, at *4 (E.D. Ky. Jan. 27, 2011). Because the issue has been fully briefed and appellate court guidance seems unlikely to arrive in the near future, the Court finds it appropriate to decide this question now.

### 3. Whether *BMS* Applies to Unnamed Members of a Putative Class Action Suit

No Court of Appeals has engaged the question of whether *BMS* requires a finding of specific personal jurisdiction with respect to unnamed members of a putative class action suit.[5] The Ninth Circuit is the only federal appellate court that has applied *BMS* in a class action context, and that decision is easily distinguishable from the matter here.[6] There is

---

[5] At least one case has been appealed in the Ninth Circuit, *Feller v. Transamerica Life Insurance Co.*, No. 18-55408 (9th Cir. Mar. 27, 2018).

[6] *Matus v. Premium Nutraceuticals, LLC*, 715 Fed. App'x 662, 663 (9th Cir. 2018). The Ninth Circuit in *Matus* found no specific jurisdiction over the defendant with respect to the *named plaintiff* of the purported class action. Such a conclusion flows logically from

disagreement in the district courts over the application of *BMS* to unnamed members of a putative class action. NNA relies on a line of cases from the Northern District of Illinois for its assertion that *BMS* should be extended to class actions. Outside of that district court, however, very few courts have extended *BMS* to unnamed class members, and one of the courts addressed the issue only briefly in a footnote. *See Wenokur v. AXA Equitable Life Ins. Co.*, No. CV-17-00165-PHX-DLR, 2017 WL 4357916, at *4 n.4 (D. Ariz. Oct. 2, 2017); *see also In re Dental Supplies Antitrust Litig.*, No. 16 Civ. 696 (BMC)(GRB), 2017 WL 4217115, at *9 (E.D.N.Y. Sept. 20, 2017); *Spratley v. FCA US LLC*, No. 3:17-CV-0062, 2017 WL 4023348, at *8 (N.D.N.Y. Sept. 12, 2017). The Illinois cases generally assert that because nothing in *BMS* precludes its application to class actions, and because its rationale appears broadly applicable, it is "instructive" and therefore should be applied by courts in the class action context. *See McDonnell v. Nature's Way Prod., LLC*, No. 16 C 5011, 2017 WL 4864910, at *4 (N.D. Ill. Oct. 26, 2017); *DeBernardis v. NBTY, Inc.*, No. 17 C 6125, 2018 WL 461228, at *2 (N.D. Ill. Jan. 18, 2018).

Defendant also argues that excluding class actions from the *BMS* rule would violate the Rules Enabling Act, 28 U.S.C. § 2072. That argument was addressed in *Practice Management Support Services, Inc. v. Cirque du Soleil, Inc.*, No. 14 C 2032, 2018 WL 1255021, at *16 (N.D. Ill. Mar. 12, 2018), in which the court quoted the Supreme Court's admonition that "Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that the rules of procedure

---

*BMS* but is inapposite here, as both parties agree that there is specific jurisdiction with respect to the claims of the *named plaintiff*.

shall not abridge, enlarge, or modify any substantive right." *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 592, (1997)). The *Cirque du Soleil* court concluded that "[t]he Supreme Court held in *Bristol-Myers* that the Fourteenth Amendment's due process clause precludes nonresident plaintiffs injured outside the forum from aggregating their claims with an in-forum resident. Under the Rules Enabling Act, a defendant's due process interest should be the same in the class context." 2018 WL 1255021, at *16.

Outside of Illinois, district courts have largely declined to extend *BMS* to the class action context. Indeed, "most of the courts that have encountered this issue have found that *Bristol-Myers* does not apply in the federal class action context." *Chernus*, 2018 WL 1981481, at *7. District courts in California[7], Louisiana[8], Florida[9], Georgia[10], Virginia[11],

---

[7] *See, e.g.*, *Swamy v. Title Source, Inc.*, No. C 17-01175 WHA, 2017 WL 5196780, at *2 (N.D. Cal. Nov. 10, 2017) (FLSA collective action); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, No. 17-CV-00564 NC, 2017 WL 4224723, at *3 (N.D. Cal. Sept. 22, 2017).

[8] *See, e.g.*, *Casso's Wellness Store & Gym, L.L.C. v. Spectrum Lab. Prod., Inc.*, No. CV 17-2161, 2018 WL 1377608, at *4 (E.D. La. Mar. 19, 2018); *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. MDL 09-2047, 2017 WL 5971622, at *12 (E.D. La. Nov. 30, 2017).

[9] *See, e.g.*, *Becker v. HBN Media, Inc.*, No. 18-60688-CIV, 2018 WL 3007922, at *3 (S.D. Fla. June 6, 2018); *Tickling Keys, Inc. v. Transam. Fin. Advisors, Inc.*, No. 6:17-CV-1734-Orl-37KRS, 2018 WL 1701994, at *6 (M.D. Fla. Apr. 4, 2018) (TCPA action).

[10] *Sanchez v. Launch Tech. Workforce Sols.*, LLC, 297 F. Supp. 3d 1360 (N.D. Ga. 2018).

[11] *Morgan v. U.S. Xpress, Inc.*, No. 3:17-CV-00085, 2018 WL 3580775, at *5–6 (W.D. Va. July 25, 2018) ("*Bristol-Myers Squibb*'s holding and logic do not extend to the federal class action context").

Texas[12], the District of Columbia[13], and even Illinois[14] have concluded that there are valid reasons for limiting *BMS* to named parties—particularly due to the material distinctions between mass tort actions and class actions, as discussed below.

The Court agrees with this broader set of cases and holds that *BMS* is inapplicable to unnamed parties in a federal class action suit. Defendant does not cite any case prior to *BMS* that stands for the proposition that, in a class action where the defendant is not subject to general jurisdiction, specific jurisdiction must be found not only as to the named plaintiff or plaintiffs, but also as to unnamed members of the putative class as well. "The pre-*Bristol-Myers* consensus, rather, was that due process neither precluded nationwide or multistate class actions nor required the absent-class-member-by-absent-class-member jurisdictional inquiry." *Haj v. Pfizer Inc.*, 17 C 6730, 2018 WL 3707561, at *1 (N.D. Ill. Aug. 3, 2018). Indeed, the Supreme Court concluded as much three decades ago in *Phillips Petroleum Co. v. Shutts* when it held "that a forum State may exercise jurisdiction over the claim of an absent class-action plaintiff, even though that plaintiff may not possess the minimum contacts with the forum which would support personal jurisdiction over a defendant." 472 U.S. 797, 811 (1985) ("*Shutts*").

The Court does not read *BMS* as altering this consensus. *BMS* was a mass tort action, not a class action, and there are meaningful differences between the two types of suits that merit different approaches to this jurisdictional question. "[I]n a mass tort action,

---

[12] *Garcia v. Peterson*, 319 F. Supp. 3d 863 (S.D. Tex. 2018) (FLSA collective action).

[13] *Molock v. Whole Foods Mkt., Inc.,* 297 F. Supp. 3d 114 (D.D.C. 2018).

[14] *Haj v. Pfizer Inc.*, 17 C 6730, 2018 WL 3707561 (N.D. Ill. Aug. 3, 2018).

each plaintiff is a real party in interest to the complaints; by contrast, in a putative class action, 'one or more plaintiffs seek to represent the rest of the similarly situated plaintiffs, and the 'named plaintiffs' are the only plaintiffs actually named in the complaint.'" *Molock v. Whole Foods Mkt., Inc.,* 297 F. Supp. 3d 114, 126 (D.D.C. 2018) (quoting *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc*., No. 17-CV-00564 NC, 2017 WL 4224723, at *5 (N.D. Cal. Sept. 22, 2017). This difference is crucial in the context of *BMS*, which framed its specific jurisdiction analysis at the level of the "suit" and not at the level of the named or unnamed parties. "'[T]he *suit*' must 'aris[e] out of or relat[e] to the defendant's contacts with the forum.'" *BMS,* 137 S. Ct. at 1780 (emphasis in the original, citations omitted). Here, there is but one "suit": the present action between Knotts and the NNA. "While Plaintiff may end up representing other class members, this is different than a mass action where independent suits with independent parties in interest are joined for trial." *Morgan v. U.S. Xpress, Inc.*, No. 3:17-CV-00085, 2018 WL 3580775, at *5 (W.D. Va. July 25, 2018). The only "suit" in this action therefore does "arise out of or relate to the defendant's contacts with the forum." *BMS*, 137 S. Ct. at 1780. NNA's argument that "defendants have a due process right not to be subjected to jurisdiction in a forum having an inadequate connection with the claim being litigated"[15] is therefore inapposite, as the "claim being litigated" has a direct connection to the forum through the named plaintiff.

In addition, a class action suit must satisfy due process procedural safeguards that do not exist in mass tort actions. As the court in *In re Chinese-Manufactured Drywall Products Liability Litigation* observed:

---

[15] *See* Def.'s Strike Reply at 9.

> This Court is cognizant of the superficial similarities between mass tort actions (like in *BMS*) and a class action in which every class member is a named plaintiff—as is the case here. But there is, nevertheless, a significant difference: a class action has different due process safeguards. . . .  In particular, for a case to qualify for class action treatment, it needs to meet the additional due process standards for class certification under Rule 23— numerosity, commonality, typicality, adequacy of representation, predominance and superiority.

No. MDL 09-2047, 2017 WL 5971622, at *12 (E.D. La. Nov. 30, 2017).   Because of Rule 23's procedural safeguards, the Supreme Court has allowed procedural flexibility for unnamed class action plaintiffs in certain contexts.

> [A]s the Supreme Court has found, "[n]onnamed class members ... may be parties for some purposes and not for others. The label 'party' does not indicate an absolute characteristic, but rather a conclusion about the applicability of various *procedural rules that may differ based on context.*" *Devlin v. Scardelletti*, 536 U.S. 1, 9-10 (2002) (emphasis added). The Supreme Court in *Devlin* specified some of these procedural rules, and all dealt with promoting expediency in class action litigation.

*Fitzhenry-Russell*, 2017 WL 4224723, at *5.  Rule 23's procedural safeguards ensure that the defendant will be "presented with a unitary, coherent claim to which it need respond only with a unitary, coherent defense."  *Sanchez v. Launch Tech. Workforce Sols*., LLC, 297 F. Supp. 3d 1360, 1366   (N.D. Ga. 2018).   Given these safeguards, due process concerns for the defendant in the class action context are far less compelling than in a mass tort such as *BMS*, where each joined plaintiff may make different claims requiring different responses.  *See Morgan*, 2018 WL 3580775, at *5 ("Due process concerns raised by that aggregation of claims are lessened in the class action context.").   Because NNA must already come to this forum to litigate the claims of Knotts and, pending certification, the Minnesota class, there is little hardship, as a jurisdictional matter, for it to also litigate the

nationwide class claims. Therefore, it promotes efficiency and expediency to litigate all claims at once rather than to separate the nationwide class. *See Sanchez*, 297 F. Supp. 3d at 1366 ("Because of the unitary nature of that class claim, the Court perceives no unfairness in haling the defendant into court to answer to it in a forum that has specific jurisdiction over the defendant based on the representative's claim.").

Defendant's reliance on *Shutts* is misplaced. As noted earlier, *Shutts* in part stands for the proposition that courts can exercise jurisdiction over the claim of a non-named class-action plaintiff, 472 U.S. at 811, directly countering the crux of NNA's argument. The Court believes that the logic of *Shutts* counsels strongly for the result that the Court reaches here. As noted in *Sanchez*,

> [I]f due process was not offended in *Shutts*, a class-action in State court with absent non-resident plaintiff class members, 472 U.S. at 808, it is not offended by a potential class-action in federal court where the plaintiff class is made up in part with non-resident members.

297 F. Supp. 3d at 1366.

Defendant's argument concerning the Rules Enabling Act also fails. As discussed above, NNA has failed to show that it has the right to exclude non-named parties from a putative class action on the ground that there is no specific jurisdiction over claims of the non-named parties in the chosen forum. Therefore, the Court's holding does not deprive NNA of any substantive right. "It is for the same reason that the cases holding that absent class members need not establish their own standing, and are not considered for venue, diversity of citizenship, or amount-in-controversy purposes, do not violate the [Rules Enabling Act]." *Haj*, 2018 WL 3707561, at *4.

The conclusion that *BMS* did not alter prior consensus is also supported by the Supreme Court's own characterization of its holding in *BMS* as a "straightforward application . . . of settled principles of personal jurisdiction." 137 S. Ct. at 1783. Defendant urges a reading of *BMS* that would result in a wholesale change in federal class action jurisprudence, drastically reducing the number of forums where a nationwide class action could be brought. As the *Haj* court notes,

> Had the Supreme Court truly sought to bar certification of nationwide or multistate class actions on due process grounds in all but the one or two States where the defendant is subject to general jurisdiction, it implausible that it would have done so obliquely, in a mass action, and with the caveat that it was "leav[ing] open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court" as the Fourteenth Amendment does "on the exercise of specific jurisdiction by a State."

2018 WL 3707561, at *2 (quoting *BMS*, 137 S. Ct. at 1783-84). The Court agrees.

Finally, the Court's ruling here preserves the class action as an efficient mechanism for prospective plaintiffs to seek redress of their claims. As the Supreme Court noted when addressing this issue in the context of subject matter jurisdiction,

> The rule that nonnamed class members cannot defeat complete diversity is likewise justified by the goals of class action litigation. Ease of administration of class actions would be compromised by having to consider the citizenship of all class members, many of whom may even be unknown, in determining jurisdiction.

*Devlin*, 536 U.S. at 10 (citations omitted). The logic in *Devlin* applies equally here in the context of personal jurisdiction. The efficient administration of class actions would be compromised by requiring the Court to make personal jurisdiction determinations for every named and potential unnamed plaintiff, particularly at the outset of the litigation. Such an

unwieldy process would defeat the purpose of the class action mechanism. *See generally Croyden Assocs. v. Alleco, Inc.*, 969 F.2d 675, 678 (8th Cir. 1992). For all of the foregoing reasons, the Court denies Defendant's Motion to Strike.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    Defendant's Motion to Dismiss [Doc. No. 15] is **GRANTED IN PART and DENIED IN PART**; and

2.    Defendant's Motion to Strike or Dismiss Plaintiff's Class Allegations [Doc. No. 21] is **DENIED**.

Dated: October 10, 2018                                          s/Susan Richard Nelson
                                                                SUSAN RICHARD NELSON
                                                                United States District Judge